UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
DORIS OFFEI,

               Plaintiff,

      -against-

MAHMOUD ABDEL-SALAM OMAR,

          Defendant.
-------------------------------x
TO THE HONORABLE SHIRA A. SCHEINDLIN, U.S.D.J.:

REPORT & RECOMMENDATION

11 Civ. 4283 (SAS)(MHD)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/18/12

    Plaintiff Doris Offei, a native of Ghana and resident of Brooklyn, has sued Mahmoud Abdel-Salam Omar, a citizen of Egypt, alleging that Omar sexually assaulted her while she was attempting to carry out her job duties as a room attendant in the Hotel Pierre on May 29, 2011. Following entry of a default against Omar, we conducted an inquest on damages, at which Ms. Offei and her treating clinical psychologist, Dr. Thomas Boland, both testified. Based on the evidence presented at that hearing, we recommend entry of a judgment awarding plaintiff $250,000.00 in compensatory damages and $100,000.00 in punitive damages.

## I. Prior Proceedings

    Plaintiff filed her complaint on June 24, 2011, asserting common-law claims for assault and battery, false imprisonment and

1

intentional infliction of emotional distress. Although served with the complaint, Omar failed to respond, and accordingly the District Court entered a default and referred the case to me to conduct an inquest on damages. We scheduled that hearing for November 2, 2011 and gave notice to defendant of that proceeding. He chose, however, not to attend.

II. The Evidence

Ms. Offei resides in Brooklyn with her husband, to whom she has been married for 16 years, and with their four children. (Tr. 10-11).[1] At the time of the hearing, she had worked for more than a year as a room attendant at the Pierre Hotel in Manhattan. (Tr. 11). Her prior job, with similar responsibilities, was at the Sheraton Hotel. (Tr. 11).

Ms. Offei's job requires her to enter the rooms assigned to her to clean and make the beds. Hotel policy encourages room attendants to be courteous to guests who are in the room when they enter, including engaging in routine friendly conversation. (Tr. 12).

---

[1] "Tr." refers to the transcript of the November 2, 2011 inquest hearing.

2

On May 29, 2011, Ms. Offei was assigned to the rooms on the tenth floor of the hotel. (Tr. 12). At some point she encountered Mr. Omar, apparently in the hallway, and he asked whether she had cleaned his room. (Tr. 13). Since she had not yet done so, she collected her cleaning materials and rang the bell to his room, at which point he told her to return in ten minutes. (Tr. 13). She therefore went to clean another room and then returned to Mr. Omar's room, which she cleaned without incident while he was still there, the two of them engaging in brief innocuous conversation during that time. (Tr. 13-14).

At the end of Ms. Offei's shift, which was 10:00 a.m. to 6:00 p.m., her supervisor asked her to take three tissue boxes to Mr. Omar's room. (Tr. 12, 15). She entered the room and encountered him. (Tr. 15). After asking a brief question as to why Ms. Offei was delayed in cleaning the room that morning, Mr. Omar announced "oh Doris, I like you" and proceeded to seize her in a bear hug, kiss her on the lips and the neck, squeeze her breasts and rub his clothed penis against her. (Tr. 15-16). Ms. Offei asked him to stop, telling him that she was a married woman, and that she had come to the room only to deliver the tissue boxes. (Tr. 16). As she tried to escape, he blocked her way and grabbed her again from behind, once more kissing her and seizing her breasts. (Tr. 16).

3

She pleaded with him to leave her alone, but he persisted for at least a brief period, urging her to give him her phone number so that they could "text," and squeezing her buttocks as she headed for the door. (Tr. 16).

When Ms. Offei exited the room, she went directly to her supervisor to report the incident. (Tr. 17-18). She was shaking, presumably from fright, but described in detail to the supervisor what had happened and warned her not to send a female to Mr. Omar's room because he might rape her. (Tr. 17). Ms. Offei went home, but spent a sleepless night. (Tr. 18).

When plaintiff returned to work the next morning, hotel security personnel took a statement from her and then called the police. (Tr. 18). The police also took a statement from her and then accompanied her to the 19th Precinct. (Tr. 18). She was later sent home but asked to return in the late afternoon. (Tr. 18). She came back to the precinct late in the day, accompanied by her husband and children, at which time she was again interviewed by the police and by representatives from the District Attorney's Office. (Tr. 18-19). In the late evening she was shown a lineup that included Mr. Omar, and she identified him as her assailant. (Tr. 19).

When Ms. Offei and her family left the precinct, she was besieged by news media, but they went to their car and left for home, where journalists were also gathered. (Tr. 19-20). The next day hotel staff called her and told her not to come to work because the press was encamped in front of the hotel. (Tr. 20). Because media representatives had also gathered in front of her house that day, she could not go out and her husband had to use a back door to take the children to school. (Tr. 20) That same day she was bombarded with telephone calls from the press, as well as from friends, workmates and fellow church-goers. (Tr. 20-21).

The attack and its aftermath led to a series of panic attacks by Ms. Offei, who was counseled initially by a police-assigned counselor. (Tr. 22). Plaintiff was unable to sleep, was frightened, and cried frequently, and in only a few days she lost seven pounds. (Tr. 22). On the first weekend after the assault, while suffering such a panic attack, she called 911 and an ambulance took her to Methodist Hospital for treatment. (Tr. 22).

In the wake of that hospital visit she came into treatment with Dr. Boland, whom she has seen on a weekly basis ever since. (Tr. 23). She has also been taking anti-anxiety medication prescribed by her internist since that time. (Tr. 24-25).

5

Plaintiff remained out of work from the end of May to September 1, 2011. (Tr. 24). Early in that period, Ms. Offei reported, she went through a particularly stressful time when Mr. Omar appeared in court in late June 2011 to plead guilty to a misdemeanor charge of Sexual Abuse in the Third Degree. (Tr. 27; Pl.'s Ex. 2 (Mem. of Law in Supp. of Pl.'s Claim for Damages), Ex. A ("Plea Tr."), at 4-10). The case was then covered again in the tabloid press, which among other items reported a statement by Omar's criminal defense attorney accusing Ms. Offei of exaggerating the encounter in pursuit of a big payday. (Tr. 28, 53-54; Pl.'s Exs. 3-4 (articles from New York Post and New York Daily News dated June 25, 2011)). This coverage also heightened Ms. Offei's anxiety. (Tr. 27-28).

When plaintiff returned to work, because of her experience and resulting anxiety, the Human Resources office at the hotel transferred her from room cleaning to the Guest Service department. (Tr. 24). In that capacity she is required only to accompany new guests to the floor on which their room is located, but she need not interact with them in their rooms. (Tr. 24-25).

On her first day back at work, Ms. Offei was so nervous that she had palpitations, and Dr. Boland accordingly advised her to

6

take her medication more frequently, on an as-needed basis. (Tr. 25-26). Her first week back at the hotel was easier because she was accompanied by her job trainer. (Tr. 26). Since then, however, she has found that she feels elevated anxiety if she is in the elevator alone with a male guest. (Tr. 26). Indeed, she reported an incident that had occurred shortly before the hearing, when a male guest spoke to her in the elevator, referring in somewhat jocular but suggestive terms to the recent rape charge against Dominique Strauss-Kahn -- a comment that triggered extreme anxiety and led to her taking additional medication a few minutes later. (Tr. 27).

Ms. Offei also reported that because her schedule was changed from the morning to later in the day when she began her new assignment, she does not sleep well. (Tr. 26). Her relations with her husband were also adversely affected for a period of about five weeks after the assault. (Tr. 27). She testified that during that time she was fearful of being approached or touched by him, but that this fear gradually subsided. (Tr. 27).

As of the time of the inquest hearing, plaintiff was taking her medication either once every two days or at half the original

7

daily dosage. (Tr. 25, 39).[2] She testified that she still feels a certain fear when she goes to work because of the memory of the assault, especially when she has to go to the floor where it took place. (Tr. 29).

The testimony of Dr. Boland, a clinical psychologist, was largely corroborative of Ms. Offei's account of her treatment and gradual improvement over a period of five months. He first saw Ms. Offei on June 19, 2011, approximately three weeks after the assault. (Tr. 31-32). He found initially that she was suffering from a range of anxiety-related conditions, including anxiety reactions, panic attacks, heart palpitations, a sense of being overwhelmed at times, and severe sleep disturbances. (Tr. 32). She also suffered from some short-term symptoms, notably loss of appetite and weight. (Tr. 32).

According to Dr. Boland, Ms. Offei's condition was aggravated by the coincidence of the publicity attendant to the case of Dominique Strauss-Kahn, with its intense media focus, which washed over onto her situation as well, with the result that the press

---

[2] Ms. Offei testified that she was able to reduce her dosage from three pills every two days to one pill every two days (Tr. 25), however, Dr. Boland reports that Ms. Offei was taking one pill per day. (Tr. 39).

covered her somewhat lower-profile case with heightened attention.
(Tr. 32-33). Ms. Offei was also particularly disturbed by the fact
that some media representatives were following several of her
children and hounding them for information. (Tr. 33). As a result,
for a period of weeks even her home did not serve as a real haven.
(Tr. 33). Indeed, she and her husband were even afraid to pick up
the phone when it rang or to let the children go outside. (Tr. 33-
34).

Dr. Boland described the decision of the hotel to put
plaintiff on leave as a disruption, albeit one that was necessary
to allow her to recover her psychological balance. (Tr. 35). She
also suffered from worries about the longer-term effect of the
incident on her children, who would sometimes ask her about the
changes in their lives that had resulted from the events in
question. (Tr. 38).

Dr. Boland also alluded to another stressor from the fallout
of the incident. He reported hearing from Ms. Offei that at some
point the hotel had either demoted or terminated one or two
staffers for not following required procedures in reporting the
incident. (Tr. 36-37). As he recounted the matter, these events
caused Ms. Offei to feel guilt not only about the effects of the

9

incident on her family, but also for having somehow triggered these negative outcomes for people whom she liked. (Tr. 37).

In Dr. Boland's narrative, his treatment of Ms. Offei over the summer of 2011 focused on gradually alleviating the various symptoms of anxiety while also attending to fears that were exacerbated from time to time by various unavoidable circumstances. (Tr. 37-38). These included media coverage of both the Strauss-Kahn case and Ms. Offei's situation, as well as the necessity for Ms. Offei to sit through frequent interviews by law-enforcement and prosecutorial personnel. (Tr. 38-39).

Dr. Boland believed that plaintiff was not ready through at least June and July to return to work. (Tr. 40). By August she wanted to return, and the doctor initially viewed a mid-September date as ideal since it would follow the start of several of her children in new schools. (Tr. 40-41). Ultimately, however, the hotel requested that she return at the beginning of September, and she did so. (Tr. 41). For the longer term, Dr. Boland has recommended to her that she consider another field of work because while she stays at the hotel, incidents will occur that will call to mind the sexual assault and even what followed, described by Dr. Boland as a "media assault." (Tr. 44-45). He diagnosed the

10

psychological condition of the plaintiff as acute traumatic stress disorder and implied that some symptoms would continue into the future while she returned daily to the scene of the event. (Tr. 45).

Plaintiff began taking Lorazepam daily in the wake of the incident. (Tr. 39). The doctor indicated that plaintiff has recently reduced her intake of the medication to a half pill a day, but would continue to take it for some unspecified period. (Tr. 45-46). Though she was continuing to see him, he opined that at some indefinite point in the future she should be able to discontinue that treatment, but not at present. (Tr. 46-49).[3]

## ANALYSIS

By virtue of defendant's default, we deem as true the well-pled allegations of the complaint concerning the events that caused plaintiff injury. See, e.g., Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). Liability is also established, at least in part, by

---

[3] According to Dr. Boland, among the stressors to which Ms. Offei may still be subjected are reminders at work of the event and references in the future to the Strauss-Kahn case. (Tr. 47-48).

virtue of defendant's plea to a charge of sexual assault, see City of N.Y. v. Venkataram, 2009 WL 1938984, at *4-5 (S.D.N.Y. July 7, 2009) (quoting United States v. U.S. Currency in the Amount of $119,984, 304 F.3d 165, 172 (2d Cir. 2002) (quoting U.S. v. Podell, 572 F.2d 31, 35 (2d Cir. 1978))), a step that required him to admit that he had kissed plaintiff at least twice and fondled her breasts without her consent. (See Plea Tr. at 8-9). In addition, through plaintiff's entirely credible testimony we have a vivid picture of an unprovoked sexual assault by defendant on her person. In short, he is liable to her for assault, battery, wrongful imprisonment and intentional infliction of emotional distress.[4]

---

[4] Under New York law, an assault involves "an intentional placing of another person in fear of imminent harmful or offensive contact" and a battery is "an intentional wrongful physical contact with another person without consent." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (citations omitted). As for false imprisonment, "[a] plaintiff asserting [such] a common-law claim . . . must establish that the defendant intended to confine the plaintiff, that the plaintiff was conscious of the confinement and did not consent to the confinement, and that the confinement was not otherwise privileged." Martinez v. City of Schenectady, 97 N.Y.2d 78, 85, 735 N.Y.S.2d 868, 875 (2001). To establish a claim of intentional infliction of emotional distress, a plaintiff must demonstrate "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., Inc., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993).

I. Compensatory Damages

Compensatory damages recoverable for sexual assault, battery, and intentional infliction of emotional distress include "compensation for the injury itself, conscious pain and suffering including mental and emotional anxiety which can be based on the plaintiff's subjective testimony plus special damages, which need not be pleaded." Deborah S. v. Diorio, 153 Misc.2d 708, 715, 583 N.Y.S.2d 872, 878 (Civ. Ct. 1992).

Plaintiff's testimony and that of Dr. Boland amply establish the fact that defendant's assault caused Ms. Offei serious psychological harm that continues to some degree to the present and promises to echo, in hopefully lesser terms, in the future. That said, we recognize that quantifying such injuries in monetary terms is a very impressionistic exercise, for which no ready formula is at hand. We rely principally on the extended and documented nature of the effects from the assault and the circumstances that appear to have aggravated its impact, and look as well to other cases in which awards have been made in circumstances somewhat akin to those encountered here.

As the Supreme Court has noted, the crime of sexual assault is

13

inherently violent in nature and, even if not accompanied by violence, may inflict serious psychological damage on the victim. See <u>Coker v. Ga.</u>, 433 U.S. 584, 597-98 (1977). As the <u>Coker</u> court observed:

> Short of homicide, [sexual assault] is the ultimate violation of self. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. [Although sexual assault] is very often accompanied by physical injury to the [victim, it] can also inflict mental and psychological damage.

<u>Id.</u> (internal quotations omitted). As one state court elaborated, "[i]t does not matter that the sexual assault was unaccompanied by serious physical injury." <u>Doe v. Hines</u>, 2012 WL 1089626, at *4 (Conn. Super. Ct. Mar. 7, 2012) (quoting <u>State v. Rivera</u>, 260 Conn. 486, 492, 798 A.2d 958, 961 (2002)).

Although these decisions involved claims of completed rape -- a result that defendant here did not achieve and perhaps did not intend -- they underscore the fact that his actions could predictably cause severe non-physical injury to the victim. Thus, it is not particularly surprising that in this case Ms. Offei appears to have suffered, and to be still suffering, serious

14

adverse effects from Mr. Omar's attack.

A review of other cases involving sexual assaults reflects that they frequently trigger substantial compensatory awards, typically in the low-to-mid hundreds of thousands of dollars, although these cases usually involve more egregious conduct on the part of the defendant or specific evidence of resulting harm, including some or all of the following: (1) rape or the equivalent, (2) repeated episodes of abuse, sometimes occurring over a period of years, (3) the victimization of children, often by family members, or (4) proof of psychiatric treatment and/or concrete evidence of extended psychological dysfunction. See, e.g., Cash v. Cnty. of Erie, 2009 WL 3199558, at *1, *3 (W.D.N.Y. Sept. 30, 2009) (awarding $500,000.00 in compensatory damages for rape of inmate by corrections officer); Town of Hempstead v. Div. of Human Rights, 233 A.D.2d 451, 454-57, 649 N.Y.S.2d 942, 942, 944-46 (2d Dep't 1996) (awards of $200,000.00 to $500,000.00 upheld for repeated lewd acts by employees' supervisor, including self-exposure, forced kissing, grabbing of breasts, rubbing and objectionable comments); Leddy v. Raccio, 2008 WL 2345116, at *1, *8-11 (Conn. Super. Ct. May 19, 2008) (awarding $150,000.00 in non-economic damages for sexual assaults over approximately eight years against a minor by a family friend; actions involved genital manipulation and

kissing); <u>Deborah S.</u>, 153 Misc.2d at 716, 583 N.Y.S.2d at 878 (awarding $100,000.00 in emotional-distress damages for one instance of "date rape"); <u>see</u> <u>also</u> <u>Doe v. City of Waterbury</u>, 2009 WL 3348314, at *2-3 (D. Conn. Oct. 15, 2009) (awarding $8 million each to two girls who were prostituted by their mother to the mayor of the defendant, starting when they were prepubescent; court notes that this occurred 128 times over the years) (citing <u>Grisanti v. Cioffi</u>, 2001 WL 777435, *12-13 (D. Conn. June 14, 2001), <u>aff'd mem.</u>, 38 F. App'x 653 (2d Cir. 2002) (upholding award of $1.670 million to woman raped four times by defendant); <u>Walker v. Dickerman</u>, 993 F. Supp. 101, 102, 106 (D. Conn. 1997) (awarding over $1.124 million to plaintiff for long-term sexual abuse of her by her minister while she was an adolescent)).

A more precise assessment of appropriate damages in this case must necessarily focus on the evidence as to the extent of plaintiff's own injuries. On the one hand, the assault was a one-time event, and did not involve a rape or -- regardless of defendant's intent -- any overt effort to disrobe the plaintiff. Nonetheless it involved the use of force by a hotel guest, whose conduct was plainly exploitative in that he was using his status as a means of overawing a woman whom he presumably regarded as a lowly and vulnerable employee of the establishment that he was

16

patronizing. It also may not be a coincidence that his actions followed only by days the intense publicity surrounding the alleged attempted rape of another hotel room attendant by Dominique Strauss-Kahn; the implication that he was somewhat influenced by that story to believe that he might have some freedom to indulge his tastes is difficult to reject.

In any event, defendant's conduct plainly had adverse repercussions for Ms. Offei beyond what might have been expected from a brief forced embrace or two, coupled with the additional offensive invitation to her to start some form of long-distance relationship. Perhaps as a result of cultural norms, the plaintiff appears to have been particularly vulnerable to assaults on her personal integrity and  has suffered accordingly intense bouts of anxiety, guilt and even shame. Moreover, this condition was exacerbated not only by her own vulnerability but also by the intense, indeed overwhelming, media attention that the assault triggered, largely as a spillover effect of the Strauss-Kahn case. The resultant and extended loss of Ms. Offei's privacy was compounded by the impact that it had on her family, particularly her children, a circumstance that plainly aggravated the initial shock, anxiety, embarrassment and even guilt. With the documented panic attacks, the need for extended psychological treatment --

17

which as of the hearing had continued for five months -- the required course of medication, the need to stop work for three months, the constant damaging reminders of the attack when plaintiff returned to work, it is evident that plaintiff should be awarded a substantial sum in compensation for the continued long-term psychic injuries that she has been suffering.

For further guidance in setting an award, we look also to other cases, involving different forms of misconduct that triggered comparable types of psychological injury. Many of these cases have involved claims of employment discrimination or forced labor that triggered anxiety, depression and other parallel emotional phenomena and sometimes required treatment and even medication. These cases reflect a wide range of outcomes but more recently seem to result in awards in the lower six figures, particularly where the harm was suffered over an extended period of time, although awards seem somewhat smaller in cases not involving a sexual-assault component. See, e.g., Gurung v. Malhotra, --- F. Supp.2d ----, 2012 WL 983520, at *9 (S.D.N.Y. Mar. 16, 2012) (recommending $500,000.00 award for plaintiff kept prisoner as housekeeper for three years) (citing Rainone v. Potter, 388 F. Supp.2d 120, 122-23 (E.D.N.Y. 2005); Mazengo v. Mzengi, 2007 LEXIS 99277, at *23-24 (D.D.C. Dec. 20, 2007)); McGrory v. City of N.Y., 2004 WL 2290898,

18

at *5, *13-16 (S.D.N.Y. Oct. 8, 2004) (citing cases) (reducing award to $100,000.00 for discriminatory termination despite PTSD diagnosis; reduction based on pre-existing psychiatric problems); Bick v. City of N.Y., 1998 WL 190283, *22-27 (S.D.N.Y. Apr. 21, 1998) (discussing cases) (reducing jury award to $100,000.00 for discriminatory mistreatment despite documented psychological problems, including depression, and required treatment).

Though we acknowledge that the setting of a compensatory figure is an exercise in pretend exactitude, we conclude that the nature and length of plaintiff's emotional suffering, including its continuation through the period of the hearing, and its exacerbation by a variety of cultural and other circumstances, justify an award in this case of $250,000.00. Cf. Stampf v. Long Island R.R. Auth., 2011 WL 3235704, at *12 (E.D.N.Y. July 28, 2011) (citing cases where emotional-distress damage awards in excess of $100,000.00, up to $400,000.00, were deemed reasonable compensation under New York law); Strader v. Ashley, 61 A.D.3d 1244, 1247-48, 877 N.Y.S.2d 747, 751 (3d Dep't 2009) (affirming $250,000.00 award for malicious prosecution where criminal charges brought against plaintiff were reported in the local newspaper and plaintiff's arrest led to loss of income; plaintiff had also suffered anxiety about his reputation in the community, felt sick to his stomach,

had difficulty sleeping and eating, lost weight, and stopped
socializing for fear of public scorn).

## II. Punitive Damages

Plaintiff also seeks an award of punitive damages. We conclude
that this request is justified.

Under New York law punitive damages are available if the trier
of fact concludes that "the wrong complained of is morally
culpable, or is actuated by evil and reprehensible motives, not
only to punish the defendant but to deter him." Walker v. Sheldon,
10 N.Y.2d 401, 404, 223 N.Y.S.2d 488, 490 (1961). The New York
Court of Appeals has further recognized that punitive damages are
appropriate for general deterrence, that is, to deter others, e.g.,
Hartford Acc. & Indem. Co. v. Vill. of Hempstead, 48 N.Y.2d 218,
225, 422 N.Y.S.2d 47, 52 (1979); Toomey v. Farley, 2 N.Y.2d 71, 83,
156 N.Y.S.2d 840, 849 (1956), and the New York courts have shown a
willingness to impose such an award in the case of sexual assaults,
even in the absence of a fiduciary or equivalent relationship.
E.g., Deborah S., 153 Misc.2d at 716, 583 N.Y.S.2d at 878-79; cf.
Gurung, 2012 WL 983520, at *10; Cash, 2009 WL 3199558 at *3-4.

20

As for the amount of an award, we must look to such considerations as "defendant's motive; the existence or absence of malice or intentional disregard for plaintiff's rights or reckless indifference thereto; the nature, quality and duration of harm inflicted upon plaintiff; defendant's financial wealth or assets; and the degree of deterrent resulting from a punitive award." Deborah S., 153 Misc.2d at 716, 583 N.Y.S.2d at 878 (citing Le Mistral v. CBS, 61 A.D.2d 491, 494-95, 402 N.Y.S.2d 815, 817-18 (1st Dep't 1978); Levine v. Abergel, 127 A.D.2d 822, 825, 512 N.Y.S.2d 218, 220 (2d Dep't 1987)).

In this case the defendant not only demonstrated utter disregard for his victim's right to be left alone, but he committed an admittedly criminal act. See generally Laurie Marie M. v. Jeffery T.M., 159 A.D.2d 52, 58, 559 N.Y.S.2d 336, 340 (2d Dep't 1990) (upholding punitive damage award for sexual abuse of child by family member; court observes that punitive award depends on showing of at least "quasi-criminal conduct" or "utterly reckless behavior," "malicious intent" to injure the plaintiff, or wanton fraud or other immoral behavior (internal citations omitted)). Mr. Omar's misconduct, although brief, had very serious long-term consequences for the plaintiff and her family, and was directed at someone whom he undoubtedly perceived as vulnerable and hence

21

perhaps compliant to his wishes or at least fearful of complaining. Finally, as should be evident from the confluence with the Strauss-Kahn case, the need for general deterrence is particularly appropriate in this context, in which low-level hotel employees and other service workers must labor in circumstances that expose them to potentially great harm from predatory customers of their employers.

Finally, we note that by defendant's default, he has surrendered the opportunity to demonstrate that his financial circumstances should constrain the amount of any such award. See Mathie v. Fries, 121 F.3d 808 (2d Cir. 1997) ("Under well established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'" (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 373 (2d Cir. 1988))). We note also that his stay at the Pierre Hotel suggests a lack of any financial constraints, at least at the level of award that we are contemplating, since the Pierre is a notably high-end establishment. See Taj Hotels Resorts and Palaces, The Pierre, http://www.tajhotels.com/Luxury/Grand-Palaces-And-Iconic-Hotels/The-Pierre-New-York/Overview.html (last visited May 18, 2012); cf. DiSorbo v. Hoy, 343 F.3d 172, 189 n.9 (2d Cir. 2003)

22

("[O]ne purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay." (alteration in original) (quotation omitted)); Deborah S., 153 Misc.2d at 716, 583 N.Y.S.2d at 878-79 (punitive-damages award of $200,000.00 appropriate; defendant did not directly prove that his financial circumstances warranted a limitation of a punitive damages award, and no evidence was presented to show that defendant, who was employed prior to his arrest as a realty manager and rent collector, was "not a wealthy man").

As for the amount of the punitive damages, setting a figure is, again, a somewhat arbitrary exercise. Nonetheless, we conclude that imposition of a punitive damage award of $100,000.00 is appropriate under all of the circumstances here. See, e.g., Cash, 2009 WL 3199558 at *4 (reducing jury punitive award to $150,000.00 for prisoner raped by corrections officer); Deborah S., 153 Misc.2d at 716, 583 N.Y.S.2d at 878-79 (punitive award of $200,000.00 to victim of date rape).

<u>CONCLUSION</u>

For the reasons stated, we recommend that judgment be entered in favor of plaintiff and against defendant in the amount of

23

$250,000.00 in compensatory damages and $100,000.00 in punitive damages.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Shira A. Scheindlin, Room 1620, 500 Pearl Street, New York, New York, 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636 (b)(1); Fed. R. Civ. Pro. 72, 6(a), 6(e); Thomas v. Arn, 474 U.S. 140 (1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d. Cir. 2000) (citing Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)).

Dated: New York, New York
       May 18, 2012

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of this Report & Recommendation are being mailed today to:

John Grill, Esq.
O'Connor Redd LLP
200 Mamaroneck Avenue
White Plains, NY 10601

Mr. Mahmoud Abdel-Salam Omar
c/o El Mex Salines
2 Horriah Avenue
Alexandria, Egypt 21599